*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TRASHAWN DEMARQUS JOHNSON,

Defendant-Appellant.

UNPUBLISHED
January 13, 2025
11:50 AM

No. 364570
Jackson Circuit Court
LC No. 2021-002468-FC

Before: BORRELLO, P.J., and MALDONADO and WALLACE, JJ.

PER CURIAM.

A jury convicted defendant of two counts of assault with intent to murder, MCL 750.83; three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; and one count each of carrying a concealed weapon (CCW), MCL 750.227; and possession of a firearm by a felon (felon-in-possession), MCL 750.224f(1).[1] The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12(1)(a), to serve concurrent prison terms of 300 to 600 months for each assault-with-intent-to-murder conviction and 36 to 120 months each for the CCW and felon-in-possession convictions. The trial court also sentenced defendant to serve two years for the three felony-firearm convictions, to be served consecutively to and before defendant's other sentences. Defendant appeals his convictions and sentence by right, alleging various constitutional violations, as well as evidentiary and sentencing errors. For the reasons set forth in this opinion, we affirm defendant's convictions and sentences.

## I. RELEVANT FACTS AND PROCEEDINGS

Defendant's convictions stemmed from a shooting that took place in the parking lot of a Jackson nightclub during the early morning hours of July 18, 2021. Three people were injured in the incident. Surveillance cameras focused on the parking lot recorded the shooting but did not capture the faces of the shooters. Two of the victims testified at trial that they did not see the person

---

[1] The jury acquitted defendant of one count of assault with intent to murder and one count of possession of a firearm during commission of a felony.

-1-

who shot them. The third victim was reportedly never located and did not testify at trial. Defendant refers to this third victim as John Doe because, as defendant explains, this individual's name was not admitted into evidence during the trial. The prosecution identifies John Doe on appeal as Cortarius Tribblett, who was also identified outside the jury's presence during the trial court.

In August 2021, Detective Sergeant Samuel Sukovich of the Jackson County Sheriff's office was investigating a recent home invasion in Summit Township. Several firearms were stolen during the incident, and the victim identified a potential suspect. A detective from the Jackson Police Department, collaborating with Det. Sgt. Sukovich on this case, reached out to defendant's parole officer. The parole officer informed detectives that defendant was monitored by a tether, which indicated that he had remained at home throughout the day. Nonetheless, the parole officer requested that detectives perform a parole search of defendant. Det. Sgt. Sukovich went with other officers to conduct the search, which turned up a loaded Glock 26, nine-millimeter handgun. Defendant was arrested, and Det. Sgt. Sukovich seized the handgun, ammunition, and defendant's cell phone. Analysis of a DNA swab taken from the firearm recovered from defendant's residence and a buccal swab taken from defendant provided very strong support that defendant was a contributor to the DNA found on the gun. It was subsequently determined that three cartridge casings found at the scene of the July 18 shooting had been fired from the gun found in defendant's residence.

Detective Sergeant Sukovich subsequently obtained a copy of the surveillance video from the shooting incident. From this footage, he identified specific articles of clothing worn by one of the shooters. He then secured a search warrant to revisit defendant's residence in search of those particular garments. Detective Sergeant Sukovich seized several clothing items, and during the trial, he compared photographs of these items with still images from the surveillance video that depicted the shooter wearing the same or similar attire and footwear.

In late August 2021, following multiple contacts from law enforcement, Whitney Hines visited the Sheriff's Department to review a photo lineup of potential suspects in connection with the shooting. Surveillance footage recorded her interacting with the alleged shooters in the nightclub parking lot prior to the incident. Hines examined six photographs and identified defendant's image as belonging to a man she recognized as "Tra," who was among those with her on the night of the shooting. The record contains an eyewitness identification form regarding the photo lineup, signed by Hines. According to the form, Hines's signature attests to the fact that she was provided with the instructions for the photo lineup that are memorialized on the form and that the administering law enforcement officer's included statement accurately reflects what Hines stated. The form indicates that Hines expressed "100%" confidence in her identification. The form also indicates that the instructions given to her included that "[a] photograph of the person who is involved in the crime may or may not be among" the provided photographs and that she "should not feel compelled to make an identification."

Following his arrest, defendant filed a motion with the trial court seeking to suppress Hines's pretrial identification. Defendant argued that Hines's level of intoxication at the time of the shooting rendered her pretrial identification unreliable. Furthermore, defendant asserted that law enforcement exerted undue pressure on Hines to make an identification. However, the trial court denied defendant's motion to suppress, citing the following grounds: (1) there was no assertion that the lineup photographs were improperly suggestive; (2) Hines provided written

confirmation that she was 100% confident in her identification of the defendant; and (3) Hines expressed more concern about potential repercussions from her involvement in the case than about her confidence in her identification. Defendant also moved the trial court to suppress the gun and cell phone seized from his home during the parole search. He asserted that there was no reason to believe that he violated any parole conditions when law enforcement conducted the parole search. After taking the matter under advisement, the trial court ruled from the bench that it felt compelled to deny defendant's motion based on the reasoning in *Samson v California*, 547 US 843, 857; 126 S Ct 2193; 165 L Ed 2d 250 (2006).

Defendant was convicted as indicated. Subsequently, he moved unsuccessfully in the trial court for a new trial and an evidentiary hearing. He also filed two motions for remand in this Court, both of which we denied.[2] Defendant now appeals. Further facts from the trial court record that are necessary to the resolution of the issues on appeal will be discussed in the context of our analysis below.

## II. STANDARDS OF REVIEW

Alleged constitutional violations involve questions of law subject to de novo review on appeal. See *People v Odom*, 276 Mich App 407, 421; 740 NW2d 557 (2007). "We review for clear error a trial court's findings of fact in a suppression hearing, but we review de novo its ultimate decision on a motion to suppress." *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009). "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *People v Fawaz*, 299 Mich App 55, 60; 829 NW2d 259 (2012) (quotation marks and citation omitted). The trial court's application of the law to the facts on a suppression motion is a constitutional issue that this Court reviews de novo. *People v Sammons*, 505 Mich 31, 41; 949 NW2d 36 (2020).

We review for an abuse of discretion a trial court's decision on a motion for a mistrial. *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010). We also review for an abuse of discretion a trial court's decision whether to admit evidence, *People v Duncan*, 494 Mich 713, 722; 835 NW2d 399 (2013), and "a trial court's determination of due diligence and the appropriateness of a 'missing witness' instruction . . . ." *People v Eccles*, 260 Mich App 379, 389; 677 NW2d 76 (2004). "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561, 566 (2017) (quotation marks and citation omitted).

Unpreserved claims of error, whether of constitutional or nonconstitutional magnitude, are reviewed under the plain-error standard. *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999). To prevail under plain-error review, defendants must establish that error occurred, that the error was obvious, and that it affected their substantial rights. *Id*. at 763. An error affected substantial rights if it "affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent

---

[2] *People v Johnson*, unpublished order of the Court of Appeals, entered April 18, 2024 (Docket No. 364570); *People v Johnson*, unpublished order of the Court of Appeals, July 24, 2024 (Docket No. 364570).

-3-

defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks, citation, and alteration omitted).

Lastly, whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's factual findings, if any, are reviewed for clear error, while questions of constitutional law are reviewed de novo. *Id*. Because we denied defendant's motion to remand, our review is limited to mistakes apparent on the record. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

## III. CONSTITUTIONAL CHALLENGES

## A. PRETRIAL IDENTIFICATION

Defendant contends that the trial court made an error by denying his motion to suppress Hines's pretrial identification as well as any in-court identifications. He asserts that the police presented a photo array that was excessively suggestive, thereby violating defendant's due process rights.

The Due Process Clause of the United States Constitution, as well as the analogous Due Process Clause of the Michigan Constitution protect a defendant against impermissibly suggestive photographic identification procedures. *People v Gray*, 457 Mich 107, 111 & n 5; 577 NW2d 92 (1998), citing US Const, Am XIV; Const 1963, art 1, § 17. See also *People v Posey*, 512 Mich 317, 331; 1 NW3d 101 (2023) (opinion by BOLDEN, J.) ("The procedure used to obtain identification evidence of a witness is an important consideration under the both the state and federal Constitutions' protections of defendants' rights to due process of law.")

"A photographic identification procedure violates a defendant's right to due process of law when it is so impermissibly suggestive that it gives rise to a substantial likelihood of misidentification." *Gray*, 457 Mich at 111 (citations omitted). If a trial court finds that a pretrial identification procedure was impermissibly suggestive under the totality of the circumstances, then testimony about that identification is inadmissible at trial. *People v Kurylczyk*, 443 Mich 289, 302-303; 505 NW2d 528 (1993). "However, in-court identification by the same witness still may be allowed if an independent basis for in-court identification can be established that is untainted by the suggestive pretrial procedure." *Id*. at 303.

Our Supreme Court has indicated that impermissible suggestion occurs if "the witness when called by the police or prosecution either is told or believes that the police have apprehended the right person" or "the witness is shown only one person or a group in which one person is singled out in some way." *Gray*, 457 Mich at 111 (quotation marks and citations omitted). The Supreme Court has explained in more detail as follows:

> Generally, the photo spread is not suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features and thus sufficient to reasonably test the identification." Thus, differences in the composition of photographs, in the physical characteristics of the individuals photographed, or in the clothing worn by a defendant and the others pictured in a

photographic lineup have been found not to render a lineup impermissibly suggestive.

However, a court will find that a witness' identification of a defendant was the product of an improper photographic identification if differences in the photographs led to a substantial likelihood of misidentification. In such cases, witnesses typically select a defendant on the basis of some external characteristic, rather than on the basis of the defendant's looks." [*Kurylczyk*, 443 Mich at 304-305 (quotation marks and citations omitted).]

"The relevant inquiry, therefore, is not whether the lineup photograph was suggestive, but whether it was unduly suggestive in light of all of the circumstances surrounding the identification." *Id.* at 306. When evaluating the likelihood of misidentification under the totality of the circumstances, courts consider factors that include " 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " *Id.* at 306, quoting *Neil v Biggers*, 409 US 188, 199-200; 93 S Ct 375; 34 L Ed 2d 401 (1972).

Here, defendant first asserts that the photographic lineup shown to Hines was unduly suggestive because his photograph was the only one that showed a person with a face tattoo under the left eye. Physical differences among lineup participants are significant only to the extent that they are apparent to the witness and substantially distinguish the defendant from the other lineup participants. *Kurylczyk*, 443 Mich at 304-306, 311-312.

Defendant's facial tattoo did not meaningfully differentiate him from the other participants in the lineup. The electronic reproductions of the photo array submitted to this Court indicate that if the tattoo was visible to Hines, it was not a distinctly prominent element of the photograph. In fact, the marking that defendant identifies on appeal as his facial tattoo is so diminutive and unclear in the image that it appears more like a minor skin discoloration than a tattoo. Furthermore, several other photographs in the array display similar skin discolorations in the same general facial region. Thus, contrary to defendant's assertion, nothing about this feature unduly attracted attention to defendant's photograph in the array. Additionally, although defendant contends that Hines selected the only photograph of an individual with a facial tattoo, he fails to provide any evidentiary support for his claim that Hines chose that photograph specifically because of the facial tattoo. See *id.* at 304-305. There is no evidence that the photo array was itself unduly suggestive. *Id.* at 304-306.

Defendant contends that the photo lineup was unduly suggestive, thereby creating a substantial likelihood of misidentification when considered under the totality of the circumstances. Defendant maintains that Hines lacked a sufficient opportunity to view the shooter at the time of the crime due to several factors: she had no prior acquaintance with the shooter, her observations occurred in a dimly lit parking lot at 2:00 a.m., she acknowledged not paying close attention, and she testified to being significantly intoxicated, resulting in a lack of independent recollection of the incident. Furthermore, the defendant asserts that Hines could not accurately describe the individual she interacted with that night, a considerable amount of time passed between the shooting and her identification from the photo array, and Hines attempted to retract her identification.

However, the record demonstrates that Hines exhibited "100%" confidence in her identification at the time of the photo array. Additionally, Hines testified that she spoke with the defendant that night, despite not having met him before, and she recounted how he leaned against her car while conversing with her and "rolling a blunt." Following the suppression hearing, the trial court determined that Hines, in her attempts to recant her identification of the defendant, was primarily motivated by a desire to conclude her involvement in the case. We do not view the trial court's findings regarding Hines' credibility as clearly erroneous. *Hyde*, 285 Mich App at 436. The trial court also did not clearly err by finding that there was not a substantial likelihood of misidentification under the totality of the circumstances. *Id.*; *Kurylczyk*, 443 Mich at 304-306.

Additionally, defendant argues that the police conduct in administering the photographic identification procedure was coercive because the police contacted Hines multiple times to obtain her participation, the police did not conduct a "double blind" identification procedure, and the procedure was not video recorded. However, defendant does not provide any binding legal authority supporting his assertion that any of the police actions were legally improper, thereby abandoning these arguments. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Hines also signed a form indicating that she expressed "100%" confidence in her identification, that she had been informed that "[a] photograph of the person who is involved in the crime may or may not be among" the provided photographs, and that she had been advised "not [to] feel compelled to make an identification."

Moreover, even were we to assume that there were some improprieties committed by the police in this case,[3] that would not have automatically entitled defendant to have the photo identification evidence suppressed. The United States Supreme Court has explained as follows:

> An identification infected by improper police influence, our case law holds, is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is "a very substantial likelihood of irreparable misidentification," *Simmons v United States*, 390 US 377, 384; 88 S Ct 967; 19 L Ed 2d 1247 (1968), the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth. [*Perry v New Hampshire*, 565 US 228, 232; 132 S Ct 716; 181 L Ed 2d 694 (2012).]

In this case, as previously discussed, the defendant has failed to demonstrate a significant likelihood of misidentification. Consequently, he has not established on appeal that the trial court erred in denying the motion to suppress the photo identification evidence. *Id*.

Defendant next argues that in-court identification testimony was also inadmissible because the impermissibly suggestive photo array tainted it, and there was no independent basis for the in-

---

[3] We assume this conclusion for the sake of argument and express no opinion on whether any of the police conduct relative to the identification was improper.

court identification. However, based on our conclusion that the photographic identification procedure was not impermissibly suggestive, defendant's argument does not establish that any in-court identification was inadmissible. *Kurylczyk*, 443 Mich at 303.

Defendant alternatively contends that he received ineffective assistance of counsel due to trial counsel's failure to challenge the photo array because it was unduly suggestive, particularly regarding the photograph of defendant's face. To establish ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. See *Smith v Spisak*, 558 US 139, 149; 130 S Ct 676; 175 L Ed 2d 595 (2010); *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Here, defendant has not satisfied the prejudice prong. Even if defense counsel had contended at the suppression hearing that the photo array was unduly suggestive due to the defendant's distinctive face tattoo, defendant has not demonstrated a reasonable probability that the outcome of the suppression hearing would have differed. As previously discussed, the tattoo was neither a particularly prominent nor notably noticeable feature in defendant's lineup photograph that significantly drew attention. Therefore, defendant has not established that he received ineffective assistance of counsel regarding this matter.

B. Fourth Amendment

Defendant contends that the trial court erred in denying his motion to suppress evidence obtained from the search of his residence. This search was carried out under the terms of his parole, which allows for warrantless searches of his person and property for any reason. He argues that this search infringed upon his federal and state constitutional rights against unreasonable searches, as it was conducted without probable cause or a warrant, and he asserts that he did not provide actual consent to the parole condition that waived his constitutional expectation of privacy. Furthermore, defendant argues that parolees enjoy greater privacy rights under the Michigan Constitution compared to those under the United States Constitution.

Both the United States Constitution and the Michigan Constitution protect against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. "Michigan's constitutional prohibition against unreasonable searches and seizures is to be construed to provide the same protection as that secured by the Fourth Amendment of the United States Constitution, absent compelling reason to impose a different interpretation." *People v Bolduc*, 263 Mich App 430, 437 n 9; 688 NW2d 316 (2004). "[A] search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Chandler*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368736); slip op at 3 (quotation marks and citation omitted). "In general, searches conducted without both a warrant and probable cause to believe evidence of wrongdoing might be located at the place searched are unreasonable per se." *Id*. (quotation marks and citation omitted).

It is undisputed that defendant was on parole at the time his residence was searched. During the suppression hearing, defendant's Michigan parole officer, Michelle Wahtola, testified that he was on parole in Georgia but was residing in Michigan under an interstate parole agreement. This agreement included "courtesy supervision" from Michigan, necessitating that defendant adhere to the parole conditions of both Michigan and Georgia. A standard requirement of Michigan parole

mandates that a defendant consent to searches conducted by parole agents or law enforcement for "any reason whatsoever." Furthermore, the record reveals a Michigan parole orientation document bearing the defendant's signature, confirming his acknowledgment and acceptance of the conditions associated with Michigan's parole supervision. It is noteworthy that while Wahtola's explanation of the relevant search condition was somewhat imprecise, the statute governing this condition clearly authorizes searches of parolees and their property "upon demand," without requiring any specific level of suspicion. However, it also stipulates that such searches should not be conducted for purposes of harassment. MCL 791.236(19) provides as follows:

> (19) The parole order must require the parolee to provide written consent to submit to a search of his or her person or property upon demand by a peace officer or parole officer. The written consent must include the prisoner's name and date of birth, his or her physical description, the date for release on parole, and the ending date for that parole. The prisoner shall sign the written consent before being released on parole. The department shall promptly enter this condition of parole into the department's corrections management information system or offender management network information system or into a corresponding records management system that is accessible through the law enforcement information network. Consent to a search as provided under this subsection does not authorize a search that is conducted with the sole intent to intimidate or harass.

Initially, law enforcement officers searched defendant's residence after Wahtola requested their assistance in performing a parole search on her behalf. At that time, defendant had not yet been identified as a suspect in the shooting pertinent to this case; however, authorities had suspicions regarding his involvement in a home invasion that led to the theft of firearms. During this search, the police seized a firearm that was later connected to the shooting for which defendant was ultimately convicted. Following the suppression hearing, the trial court denied the motion to suppress based on *Samson*, 547 US 843.

In *Samson*, the United States Supreme Court held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id*. at 857. The Court reasoned that parolees do not have an expectation of privacy that society recognizes as legitimate because "parole is an established variation on imprisonment of convicted criminals . . . . The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id*. at 850-852 (quotation marks and citations omitted; ellipsis in original). The Court also concluded that the state had a substantial interest in supervising parolees to prevent recidivism and foster reintegration into society. *Id*. at 853. Hence, the Court determined that under the totality of the circumstances, suspicionless searches of parolees were reasonable, provided they were not arbitrary, capricious, or harassing. *Id*. at 848, 856-857.

Additionally, the *Samson* Court compared parole to probation and observed that on the continuum of punishments, "parole is more akin to imprisonment than probation is to imprisonment." *Id*. at 850. The Court reasoned that this justified the conclusion that parolees had *no* reasonable expectation of privacy while probationers still retained a "significantly diminished" expectation of privacy. *Id*. at 849-850.

Here, since defendant was on parole, he did not have a legitimate expectation of privacy under the Fourth Amendment, and law enforcement officers were constitutionally permitted to conduct a search without any level of suspicion. *Id*. at 857. Thus, defendant's various complaints regarding the level of suspicion held by the officers before conducting the search are misplaced.

Nevertheless, despite defendant's efforts to depict the search as "suspicionless," it appears more accurate to conclude that the officers had at least reasonable suspicion regarding defendant's involvement in the home invasion. Even if we assume, that defendant's tether indicated he was at home during the time of the alleged home invasion, there remained conflicting evidence regarding defendant's potential involvement in the incident. "[A] State has an overwhelming interest in supervising parolees because parolees . . . are more likely to commit future criminal offenses." *Samson*, 547 US at 853 (quotation marks and citation omitted; ellipsis in original). "[T]he requirement of reasonable suspicion is not a requirement of absolute certainty: sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment . . . ." *New Jersey v TLO*, 469 US 325, 346; 105 S Ct 733; 83 L Ed 2d 720 (1985) (quotation marks and citation omitted; ellipsis in original). Under the totality of the circumstances, it would be a reasonable, "common-sense conclusio[n] about human behavior upon which practical people—including government officials—are entitled to rely" to suspect defendant was somehow involved in the home invasion and may have tampered with his tether. *Id*. at 341, 346 (quotation marks and citation omitted).[4]

Finally, although defendant complains that there is no evidence that he signed an agreement to the search condition, this argument is not factually in accord with the record. As previously described, there was testimony at the suppression hearing that the search condition is standard for all parolees in Michigan, which is in accordance with MCL 791.236(19). The record also contains a document with defendant's signature acknowledging that he had been informed of all parole conditions and agreed to them. The trial court's finding that defendant accepted the search condition was not clearly erroneous on this record. *Hyde*, 285 Mich App at 436.

Defendant further argues that the Michigan Constitution provides greater protection in this context and that the fruits of the search should have, therefore, been suppressed on that basis.

As previously stated, "Michigan's constitutional prohibition against unreasonable searches and seizures is to be construed to provide the same protection as that secured by the Fourth Amendment of the United States Constitution, absent compelling reason to impose a different interpretation." *Bolduc*, 263 Mich App at 437 n 9. In *Sitz v Dep't of State Police*, 443 Mich 744, 750; 506 NW2d 209 (1993), the Michigan Supreme Court addressed the "fundamental question . . . [of] how [to] interpret the Michigan Constitution," with a specific focus on the search and seizure protection provided in art 1, § 11 of the Michigan Constitution. The Court in *Sitz* explained that the term " 'compelling reason' should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law" and that the rule instead "compels neither the acceptance of federal interpretation nor its rejection." *Sitz*, 443 Mich at 758-

---

[4] We additionally note, relevant to the statute authorizing the parole search condition, that there is no claim that evidence exists of an intent to intimidate or harass defendant.

759. The Court stated, "In each instance, what is required of this Court is a searching examination to discover what law 'the people have made.' " *Id.* at 759 (citation omitted). Moreover,

> The judiciary of this state is not free to simply engraft onto art. 1, § 11 more "enlightened" rights than the framers intended. By the same token, we may not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection. [*Id.*]

Thus, the *Sitz* Court cautioned, "claims that art. 1, § 11 should be interpreted more expansively than the Fourth Amendment must rest on more than a disagreement with the United States Supreme Court." *Id.* at 752-753. Although there exists an obligation for courts of this state to "interpret our own organic instrument of government," there must be a "principled basis in the history of our jurisprudence for the creation of new rights" and "the courts of this state should reject unprincipled creation of state constitutional rights that exceed their federal counterparts." *Id.* at 763.

In *People v Carr*, 370 Mich 251, 253-254, 256; 121 NW2d 449 (1963), our Supreme Court held that the search and seizure provision of the Michigan Constitution was violated when the police searched the defendant's car, while the defendant was serving a jail sentence, without a warrant, the defendant's consent, or probable cause that another crime had been committed and then prosecuted him for a new crime based on incriminating evidence found during the search. The Court reasoned, "Defendant was not stripped of his civil rights and his constitutional safeguards merely because he was serving a sentence in the county jail for an unrelated misdemeanor." *Id.* at 255.

However, recognizing that probation is not the same as incarceration, this Court subsequently held that there was no "constitutional barrier" in including a waiver in a probation order as a condition of probation in which the probationer consented to search of his or her person at any time by a police officer or probation officer. *People v Richards*, 76 Mich App 695, 698-699; 256 NW2d 793 (1977). In *Richards*, 76 Mich app at 699, this Court adopted the dissenting opinion of Judge DANHOF in *People v Peterson*, 62 Mich App 258; 233 NW2d 250 (1975), in which Judge DANHOF stated as follows:

> Comparing one on probation or parole to one who is incarcerated to arrive at the conclusion that the rights of the former should be no less than those of the latter is to grossly misconceive the nature and purpose of the two forms of punishment. As recognized by the majority, probation is 'rejectable'; that is, optional and essentially voluntary. Imprisonment is not. The probationer or parolee is given a choice. The prisoner is not. Thus, as the Supreme Court stated in *People v Carr*, *supra*, a person does not lose his civil rights while incarcerated because he has not given his consent. A probationer or parolee has given his consent in return for more lenient treatment. [*Peterson*, 62 Mich App at 271 (DANHOF, J., dissenting).]

This Court continues to apply this holding from *Richards*. *People v Bensch*, 328 Mich App 1, 8; 935 NW2d 382 (2019), citing *Richards*, 76 Mich App 699 ("[T]he warrantless-search

condition of probation was constitutional because the defendant—by accepting probation—agreed to waive the constitutional right to be free from unreasonable searches and seizures.").

Defendant's reliance on *People v Woods*, 211 Mich App 314; 535 NW2d 259 (1995), is misplaced. In *Woods*, this Court stated that "even a probationer or parolee is entitled to some limited protection of their privacy interest" *under the Fourth Amendment. Id*. at 318. There is no discussion of the analogous search and seizure provision of the Michigan Constitution. Hence, whatever authoritative effect *Woods* may still possess in this area of law is subject to the decision of the United States Supreme Court in *Samson*, holding that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Samson*, 547 US at 857. We are bound by decisions of the United States Supreme Court on matters of federal constitutional law. *People v Patton*, 325 Mich App 425, 445 n 3; 925 NW2d 901 (2018).

Defendant has not demonstrated that there exists a principled basis in the history of this state's jurisprudence to justify creating his requested greater expectation of privacy for parolees under art 1, § 11 of the Michigan Constitution. *Sitz*, 443 Mich at 763. Furthermore, as we have already discussed, defendant was not subjected to a genuinely suspicionless search in any event.

Based on the foregoing analysis, defendant has not shown that any of the above arguments relying on the federal or state constitutions would have been successful in the trial court. Thus, defendant's ineffective assistance of counsel arguments, which mirror the above arguments, are without merit because defendant has not shown that but for trial counsel's alleged failures it not making these arguments, there is a reasonable probability that the outcome would have been different and defendant has therefore failed to establish the requisite prejudice. See *Smith*, 558 US at 149; *Trakhtenberg*, 493 Mich at 51. Counsel is not ineffective for failing to raise a meritless argument. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## C. SIXTH AMENDMENT

Next, defendant argues that his Sixth Amendment right[5] to an impartial jury drawn from a fair cross section of the community was violated because his jury venire included only two black people in the pool of 77 potential jurors.

To preserve a fair-cross-section challenge for appeal, the defendant "must raise this issue before the jury is empaneled and sworn." *People v McKinney*, 258 Mich App 157, 161; 670 NW2d 254 (2003). Here, although defendant raised an objection in the trial court to the composition of the jury venire, he did not raise this issue until after the jury was empaneled and sworn. Furthermore, when the trial judge asked defense counsel if he wanted to hold a hearing on the issue and take testimony from the "jury clerk" regarding the juror selection process, defense counsel expressly declined. Therefore, this issue is unpreserved for appeal, *id*., and our review is for plain error affecting substantial rights, *Carines*, 460 Mich 750, 764-765.

---

[5] Defendant also relies on the analogous provision in the Michigan Constitution. Const 1963, art 1, § 20.

A criminal defendant has a right to be tried by an impartial jury drawn from a fair cross section of the community, which is protected by both the federal and state constitution. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 428; 884 NW2d 297 (2015), citing US Const Am VI; Const 1963, art 1, § 20; *People v Bryant*, 491 Mich 575, 595, 822 NW2d 124 (2012). In *Bryant*, 491 Mich at 596-597, our Supreme Court reiterated the framework for considering alleged violations of that right stated in *Duren v Missouri*, 439 US 357; 99 S Ct 664; 58 L Ed 2d 579 (1979). To make a prima facie case of a fair-cross-section violation, the *Duren* Court required a defendant to show the following:

> "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." [*Bryant*, 491 Mich at 595, quoting *Duren*, 439 US at 364.]

The *Bryant* Court held that with respect to the second prong, "a court must examine the composition of jury pools and venires *over time* using the most reliable data available to determine whether representation is fair and reasonable. *Bryant*, 491 Mich at 599-600. This examination requires "a court to evaluate the composition of *venires* over a *significant time period rather than just the defendant's individual venire*. *Id*. at 600 (second emphasis added). It is the defendant's burden to show that the distinctive group's representation in venires from which jurors are selected is " 'not fair and reasonable in relation to the number of such persons in the community.' " *Id*. at 598, quoting *Duren*, 439 US at 364.

To meet this burden, the defendant must submit *evidence* regarding the distinctive group's representation in the composition of jury venires over a significant time, as well as the proportion of the community made up of members of the distinctive group. See *Bryant*, 491 Mich at 597-615 (discussing the statistical evidence necessary for a defendant to establish the second prong of the *Duren* test); see also *McKinney*, 258 Mich App at 161-162 (stating that because there was "no evidence in the lower court record" to support the defendant's unpreserved fair-cross section challenge, this Court had "no means of conducting a meaningful review of defendant'[s] allegations on appeal").

In this case, defendant does not cite any record evidence showing the racial composition of jury venires in Jackson County *over time* as required by our Supreme Court to demonstrate that the representation of black people in Jackson County jury venires was not "not fair and reasonable in relation to the number of such persons in the community." *Bryant*, 491 Mich at 595, 599-600 (quotation marks and citation omitted). Defendant instead relies entirely on the racial composition of his own jury venire, which is an insufficient basis on which to conclude that a distinct group's representation was not fair and reasonable. *Id*. at 601 (holding that the Court of Appeals erred by basing its conclusion under the second *Duren* prong solely on the composition of the defendant's specific venire).

Unsurprisingly, there is no evidence in the record regarding the compositions of jury venires over time because defendant expressly declined his opportunity for a hearing on the matter in the trial court. Although defendant now seeks a remand for an evidentiary hearing, he has not

offered proof of what he would establish concerning the racial composition of jury venires over time that would satisfy the second *Duren* prong. Defendant, therefore, has failed to demonstrate to this Court that he is entitled to a remand for an evidentiary hearing on this issue. See MCR 7.211(C)(1) (stating that a motion in the Court of Appeals for remand to the trial court to develop a factual record for appellate consideration of an issue "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing").

Based on the lack of record evidence to support defendant's claim of error, defendant has failed to meet his burden to show plain error requiring reversal. *Carines*, 460 Mich at 763. Finally, to the extent defendant argues that *Bryant* should be overruled, this Court is without the authority to overrule a decision of our Supreme Court. We are "bound to follow decisions of the Supreme Court unless those decisions have clearly been overruled or superseded." *People v Robar*, 321 Mich App 106, 117; 910 NW2d 328 (2017).

## D. CRUEL AND/OR UNUSUAL PUNISHMENT

Defendant next argues that his mandatory 25-year minimum sentence, pursuant to MCL 769.12(1)(a), violates both the Michigan Constitution's protection against cruel or unusual punishment, see Const 1963, art 1, § 16, and the United States Constitution's protection against cruel and unusual punishment, see US Const, Am VIII. He argues that MCL 769.12(1)(a) is unconstitutional because it is disproportionate and does not allow for an assessment of the circumstances of the particular offense or of the defendant's potential for rehabilitation. We understand defendant's argument to be a challenge to the facial validity of the statute because he raises what he contends to be fundamental flaws inherent in the statute itself, regardless of the situation in which it is applied. "A facial challenge involves a claim that a legislative enactment is unconstitutional on its face, in that there is no set of circumstances under which the enactment is constitutionally valid." *People v Burkett*, 337 Mich App 631, 637-638; 976 NW2d 864 (2021) (quotation marks and citation omitted).

In *Burkett*, this Court addressed a facial challenge to the constitutionality of MCL 769.12(1)(a), in which the defendant argued that the statute constituted cruel and/or unusual punishment under the state and federal constitutions. *Id*. at 636-638. This Court upheld the constitutionality of the statute, holding that "the minimum sentence mandated by MCL 769.12(1)(a) is neither cruel nor unusual." *Id*. at 642. The provision of the Michigan Constitution barring cruel or unusual punishment is interpreted more broadly than the Eighth Amendment of the U.S. Constitution. *People v Bullock*, 440 Mich 15, 30; 485 NW2d 866 (1992). "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Burkett*, 337 Mich App at 636 (quotation marks and citation omitted).

Here, defendant does not even cite *Burkett* and makes no attempt to distinguish that case from his own. Defendant's facial challenge to the statute is necessarily without merit based on this Court's previous decision holding that the statute was facially valid under Const 1963, art 1, § 16. *Id*. at 642.

To the extent defendant could be understood to have attempted to make an as-applied challenge, defendant also ignores the principles that "Legislatively mandated sentences are presumptively proportional and presumptively valid" and that "[i]n order to overcome the

presumption that the sentence is proportionate, a defendant must present unusual circumstances that would render the presumptively proportionate sentence disproportionate." *Id*. at 637 (quotation marks and citations omitted). Here, defendant merely argues that his sentence was disproportionate because (1) he was only 24 years old at the time of the offense and will not be eligible for parole until he is almost 50 years old; (2) one victim failed to appear to testify against him and the other two were not permanently injured; (3) and his prior criminal offenses were not for assault with intent to murder, so his current conviction did not constitute a "true repeat" offense. Defendant does not explain how any of these circumstances are "unusual," and he therefore has failed to overcome the presumption of proportionality. *Id*.

Defendant has not demonstrated that his sentence constituted cruel and unusual punishment or cruel or unusual punishment in violation of the federal or state constitutions.

## IV. MOTION FOR A MISTRIAL

Defendant next contends that the trial court abused its discretion by denying his motion for a mistrial after the prosecution referred to defendant's parole status.

This claim of error arises from the prosecutor's asking Det. Sgt. Sukovich on direct examination, "On or about August 5th, 2021, did you execute what we refer to as a parole search on a Shawn[?]" Defense counsel immediately objected before Det. Sgt. Sukovich answered. After the trial court excused the jury, defense counsel asserted that the prosecutor improperly elicited testimony from the detective about defendant's parole status and that defendant was therefore entitled to a mistrial. The trial court denied defendant's motion for a mistrial. The court reasoned that although the prosecutor's brief mention of defendant's parole status was improper, the error was not so egregious as to deny the defendant a fair trial, particularly since the jury was set to hear evidence of the defendant's previous felony conviction to support the felon-in-possession charge. Upon defense counsel's request, the trial court instructed the jury to disregard any mention of the defendant's parole status. "A mistrial should be granted only when the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Caddell*, 332 Mich App 27, 37; 955 NW2d 488 (2020) (quotation marks and citation omitted). As previously stated, a trial court's decision whether to grant a motion for a mistrial is a discretionary one that this Court will only reverse if the decision falls outside the range of reasonable and principled outcomes, thus constituting an abuse of discretion. *Schaw*, 288 Mich App at 236; *Franklin*, 500 Mich at 100.

In *People v Lane*, 308 Mich App 38, 61; 862 NW2d 446 (2014), the trial court denied the defendant's motion for a mistrial after references to his previous gang membership and time in a juvenile detention facility were placed before the jury through the redacted video of the defendant's police interview that the prosecution submitted into evidence and played for the jury. The audio portion of the gang membership references were redacted, but the closed captioning was not. *Id*. In denying the motion for a mistrial, the trial court reasoned that "the information had been on the screen for only seconds and that it could be remedied with a curative instruction." *Id*. This Court affirmed. *Id*. at 62.

In this instance, the prosecutor's inquiry regarding defendant's parole status was notably improper, yet it was brief. Defendant's trial counsel swiftly objected before any confirmation could be obtained. Furthermore, the jury was made aware of defendant's prior felony conviction related

-14-

to the charges of felon-in-possession. "The danger in revealing a defendant's parolee status is that a jury will recognize that the defendant had previously been convicted of a crime . . . ." *People v McDonald*, 303 Mich App 424, 436; 844 NW2d 168 (2013). When the jury is already informed of a defendant's prior felony conviction relative to a felon-in-possession charge, "the requisite prejudice allegedly stemming from the parole references has not been shown." *Id*. Moreover, in the present case, the trial court gave a curative instruction at defendant's request, which instructed the jury to disregard any mention of defendant's parole status. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; NW2d 836 (2003). Defendant has not shown that the trial court abused its discretion by denying the motion for a mistrial.

## V. CHALLENGE TO POLICE TESTIMONY

Defendant further contends that the trial court committed an error by permitting Det. Sgt. Sukovich to encroach upon the role of the jury by providing testimony regarding defendant's identification as depicted in the surveillance video. However, as acknowledged by defendant on appeal, the trial court did not authorize Det. Sgt. Sukovich to definitively identify defendant in the surveillance video. Instead, defendant maintains that the trial court permitted Det. Sgt. Sukovich to testify that the clothing recovered from the defendant's residence was "consistent" with the attire worn by one of the shooters in the surveillance video. It is agreed upon that Det. Sgt. Sukovich's testimony qualifies as lay opinion testimony. MRE 701 allows for the admission of lay opinion testimony and stipulates:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.[6]

In *People v Fomby*, 300 Mich App 46, 48; 831 NW2d 887 (2013), this Court addressed an argument that police testimony about individuals shown in video footage and still photographs invaded the province of the jury. The officer in that case provided "testimony [that] identified individuals depicted in still-frame photos—taken from the surveillance video—as the same individuals in the actual video." *Id*. at 49. The officer "never testified that any of the individuals depicted in either the still photographs or the surveillance video was defendant." *Id*.

This Court concluded that the officer's testimony was properly admitted lay opinion testimony under MRE 701. *Id*. at 50. In support of this conclusion, this Court reasoned that the officer's testimony was founded upon his perception of the video footage and still photographs. Although he was not present at the scene when the video was recorded, he meticulously scrutinized the footage and selectively isolated certain frames to create still images, thereby establishing a basis for forming an opinion about the identities of individuals in the video in relation to the still images derived from it. *Id*. at 50-51. Furthermore, this Court determined that the testimony aimed

---

[6] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxxxvii, cxii-cxiii (2023). We rely on the version of the rules in effect at the time defendant's motion was decided.

to elucidate whether the suspects had been present at the scene that evening and whether they were indeed the same individuals involved in the murder depicted later in the video. *Id*. at 51-52. This Court ultimately concluded that the testimony did not infringe upon the jury's role, as it did not explicitly identify the defendant as the individual depicted in the video or still photographs; such determinations are appropriately reserved for the jury, particularly when the witness possesses no superior position to arrive at such a conclusion. *Id*. at 52-53. In this instance, akin to the testimony provided by the officer in *Fomby*, Det. Sgt. Sukovich's testimony was rationally based on his perception of the video and the still photos derived from it, which he referenced to identify any distinctive features pertaining to the shooters. See MRE 701. The detective's testimony indicated that he repeatedly viewed the video and photographs to arrive at his conclusions and opinions regarding the clothing and footwear worn by the perpetrators and the extent to which they corresponded to garments and footwear obtained from the defendant's residence. This testimony was intended to provide a clearer understanding regarding the identities of the shooters, which constituted a factual issue in the case.

Similar to the officer in *Fomby*, Det. Sgt. Sukovich did not explicitly identify the defendant as the individual depicted in the video or still photographs pictures. It could also reasonably be inferred that Det. Sgt. Sukovich's testimony helped the jury to determine a fact issue in the case, see MRE 701, i.e., whether one of the shooters in the video and the still photographs wore clothing and shoes similar to those seized from defendant's closet. The video that captured the scene of the shooting shows numerous people milling about in the parking lot, with groups forming and dispersing, as well as additional people exiting the club into the parking lot. All this activity makes it challenging to know which area of the frame to focus on to see the shootings unfold. In addition, the speed of the incident and the lighting in the area where the shootings occurred makes it difficult to locate the shooters, let alone discern details about what they were wearing.

Overall, the detective's testimony preserved the integrity of the jury's role. Det. Sgt. Sukovich refrained from explicitly confirming that the clothing recovered from defendant's residence matched what was worn by one of the shooters. Instead, he indicated that the seized items bore a resemblance to those depicted in the video evidence. He permitted the jury to evaluate whether the blurred logo on the black hoodie, the frayed pants, and the color nuances of the shoes in the still images corresponded with the clothing retrieved from defendant's home. Moreover, the detective acknowledged that numerous individuals could possess similar hoodies and shoes; he did not assert that the clothing was so unique that it could solely belong to the defendant. In light of Det. Sgt. Sukovich's testimony being founded on his observations, pertinent to establishing a significant fact, and not encroaching on the jury's responsibilities, we conclude that defendant has failed to demonstrate that the trial court erred in admitting the detective's testimony. *Duncan*, 494 Mich at 722.

## VI. MISSING-WITNESS INSTRUCTION

Next, defendant argues that the trial court abused its discretion by denying his request for a missing-witness instruction based on the prosecution's failure to obtain Tribblett's attendance at trial.

A prosecuting attorney's obligation to identify and secure witnesses is governed by MCL 767.40a. The statute requires that a prosecuting attorney "attach to the filed information a

list of all witnesses known to the prosecuting attorney who might be called at trial and all res gestae witnesses known to the prosecuting attorney or investigating law enforcement officers." MCL 767.40a(1). The prosecuting attorney has an ongoing duty "to disclose the names of any further res gestae witnesses as they become known." MCL 767.40a(2). At least 30 days before trial, the prosecution must send to the defendant, or defense counsel, "a list of the witnesses the prosecuting attorney intends to produce at trial." MCL 767.40a(3). "The prosecuting attorney may add or delete from the list of witnesses he or she intends to call at trial at any time upon leave of the court and for good cause shown or by stipulation of the parties." MCL 767.40a(4).

This Court has stated that for purposes of MCL 767.40a, "[t]he inability of the prosecution to locate a witness listed on the prosecution's witness list after the exercise of due diligence constitutes good cause to strike the witness from the list." *People v Canales*, 243 Mich App 571, 577; 624 NW2d 439 (2000). "Unless the prosecution seeks to delete a witness from its witness list as provided in MCL 767.40a, '[a] prosecutor who endorses a witness under MCL 767.40a(3) is obliged to exercise due diligence to produce that witness at trial.' " *People v Everett*, 318 Mich App 511, 518-519; 899 NW2d 94 (2017), quoting *Eccles*, 260 Mich App at 388. "If the prosecution fails to produce a witness who has not been properly excused, the trial court has discretion in fashioning a remedy for the violation of MCL 767.40a, which may include a missing witness instruction." *Everett*, 318 Mich App at 519. The missing-witness instruction allows the jury to infer that the missing witness's testimony would have been unfavorable to the prosecution's case. *Id*. at 527; M Crim JI 5.12. The missing witness instruction "may be appropriate if a prosecutor fails to secure the presence at trial of a listed witness who has not been properly excused." *People v Perez*, 469 Mich 415, 420; 670 NW2d 655 (2003).

However, a "prosecutor who fails to produce an endorsed witness may show that the witness could not be produced despite the exercise of due diligence." *Eccles*, 260 Mich App at 388. Thus, "a prosecutor may be relieved of his duty to produce [an endorsed] witness by showing that the [endorsed] witness could not be produced despite an exercise of due diligence." *People v Cummings*, 171 Mich App 577, 585; 430 NW2d 790 (1988). "[D]ue diligence is the attempt to do everything reasonable, not everything possible, to obtain the presence of a witness." *Eccles*, 260 Mich App at 391, citing *Cummings*, 171 Mich App at 585.

Tribblett was clearly included in the prosecution's witness list at the start of the trial. On the first day of proceedings, the prosecution submitted a request for a material witness order to the court. The prosecutor aimed to obtain an attachment order compelling the witness to appear in court to explain why he should not be required to enter into a recognizance, necessitating bail or potential incarceration until the jury trial concluded. In their motion, the prosecution detailed that they had made five attempts to serve Tribblett personally with a subpoena to testify. The trial court approved the attachment request, and the order was subsequently issued.

On the third day of the trial, while the parties formalized the final jury instructions, defendant's counsel requested that the court furnish the instruction regarding the missing witness due to the prosecution's failure to produce Tribblett. The prosecution objected, referencing the bench warrant obtained from the court two days prior and asserting that multiple efforts had been made to personally serve Tribblett, accompanied by numerous unsuccessful attempts to contact him via telephone. The prosecutor further emphasized that ongoing efforts had been undertaken during the trial to locate Tribblett, all of which remained unfruitful. The prosecutor argued that no

evidence existed to demonstrate a lack of due diligence in securing Tribblett's attendance.

Defendant's trial counsel did not provide evidence or argument directly challenging the prosecution's claim that it exercised due diligence. Instead, defense counsel argued that defendant was entitled to the missing witness instruction because Tribblett was a res gestae witness and the prosecution had not produced him. Defense counsel characterized the analysis as a "bright line test."

The trial court took judicial notice of the ongoing efforts that had been made to procure Tribblett's presence and the bench warrant that had been issued for Tribblett, and the court ruled that the missing witness instruction was not required because the prosecution had exercised due diligence in attempting to produce Tribblett for trial.

On appeal, defendant argues that the trial court abused its discretion by denying defendant's request for the missing witness instruction because the prosecution's efforts to produce Tribblett did not constitute due diligence. Defendant now contends that the trial court's finding of due diligence was not supported by the record and was based solely on the prosecution's procurement of the bench warrant on the first day of trial. However, defendant ignores the unchallenged representations about the multiple pretrial attempts to contact and serve Tribblett with a subpoena and that these efforts continued during trial. On the current record, the trial court's ruling was not outside the range of reasonable and principled outcomes and therefore was not an abuse of discretion. *Eccles*, 260 Mich App at 389; *Franklin*, 500 Mich at 100.

Defendant does not claim that any evidence exists to support a conclusion that the prosecution did not exercise due diligence by doing everything reasonable to obtain Tribblett's presence. *Eccles*, 260 Mich App at 391. "Absent some evidence to refute the prosecutor's assertions regarding [the witness], there is no reason to disbelieve the prosecutor's representations as an officer of the court bound by a duty of candor." *Everett*, 318 Mich App at 524-525.

Defendant further argues that the prosecutor needed to prove that he did more than secure an eleventh-hour warrant to avoid the missing-witness instruction. Defendant relies on *People v James*, 184 Mich App 457; 458 NW2d 911 (1990), vacated on other grounds 347 Mich 988 (1991), to argue that the prosecutor's waiting until the day of trial to attempt to arrange for a witness's presence counsels against finding the witness unavailable. In *James*, the prosecution mailed a subpoena to a material witness and assumed that it had been received since the subpoena was not returned by the postal service as undeliverable. *James*, 184 Mich App at 467. When the witness did not appear at trial, the prosecution obtained a continuance over the weekend and law enforcement searched extensively for the witness without locating him. *Id*. at 467-468.

This Court ruled that the state's efforts came too late, explaining that due diligence required more than "simply mailing out subpoenas and then waiting until the day of trial to see who appeared" and that "[s]ome effort should have been made before trial to ensure that [the material witness] was served with a subpoena and that a return of service was filed with the court." *Id*. at 468. This Court concluded that when "only a failed attempt at service by standard mail is shown, a finding of diligent, good-faith effort is absolutely unwarranted." *Id*. at 469.

The facts of the present case are clearly distinguishable from those in *James*. Here, the record indicated that the prosecution did more than simply mail out a subpoena and wait to see if

the missing witness appeared at trial. Defendant has not challenged the prosecution's statement that it made five failed attempts to personally serve the witness with a subpoena during the two months before trial, nor has he suggested that these efforts were not reasonable under the circumstances. Defendant's reliance on *James* does not sufficiently advance his argument.

Therefore, defendant has failed to show that the trial court abused its discretion by finding that the prosecution exercised due diligence to procure the witness and, consequently, by declining defendant's request for the missing-witness instruction.

## VII. PRIOR LISTED FELONY

Lastly, defendant asserts that he is entitled to resentencing because his Georgia robbery conviction does not qualify as a "listed prior felony" under MCL 769.12.

Under MCL 769.12(1)(a), "[i]f a person has been convicted of any combination of 3 or more felonies or attempts to commit felonies, whether the convictions occurred in this state or would have been for felonies or attempts to commit felonies in this state if obtained in this state, and that person commits a subsequent felony within this state," the trial court "shall sentence the person to imprisonment for not less than 25 years" if "the subsequent felony is a serious crime or a conspiracy to commit a serious crime, and 1 or more of the prior felony convictions are listed prior felonies." For purposes of this statute, a "serious crime" is defined to include assault with intent to murder, of which defendant was convicted in this case. MCL 769.12(6)(c). The qualifying "listed prior felonies" are contained in MCL 769.12(6)(a).

Here, defendant completely ignores the rest of his criminal history, including—at a minimum—his prior Michigan conviction for carrying a concealed weapon, MCL 750.227, which is a listed prior felony under MCL 769.12(6)(a)(*iii*). Only one of the prior felony convictions needs to be a listed prior felony. MCL 769.12(1)(a). Defendant's appellate argument therefore does not establish that any error occurred. MCL 769.12(1)(a). Because defendant does not advance any other argument beyond his contention that the court could not rely on a previous Georgia robbery conviction, any further arguments that defendant could have advanced are abandoned. *Kelly*, 231 Mich App at 640-641.

## VIII. CONCLUSION

For the foregoing reasons, we find no error that requires reversal. Accordingly, we affirm defendant's convictions and sentences.

Affirmed.

/s/ Stephen L. Borrello
/s/ Allie Greenleaf Maldonado
/s/ Randy J. Wallace